## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| AISHA EDWARDS<br>2525 10th Street N<br>#217<br>Arlington, Virginia 22201<br><br>      *Plaintiff,*<br><br>v.<br><br>JACOB J. LEW,<br>SECRETARY OF THE TREASURY<br>U.S. DEPARTMENT OF TREASURY<br>1500 Pennsylvania Ave., NW<br>Washington, DC 20220<br><br>      *Defendant.* | **(Jury Trial Requested)** |

## <u>COMPLAINT</u>

Plaintiff Aisha Edwards ("Plaintiff"), by and through undersigned counsel, for her Complaint against Defendant Jacob J. Lew, Secretary of the Treasury, United States Department of Treasury ("Defendant" or the "Agency") alleges as follows:

1.      Plaintiff brings this action against Defendant for damages arising out of violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), codified at 42 U.S.C. 2000e *et seq.,* because Defendant discriminated against her on the basis of her race and sex, in the terms of her employment.

**JURISDICTION AND VENUE**

2.     This Court has jurisdiction over the federal claims in this action pursuant to 28 U.S.C. §1331 because the subject matter of Plaintiff's claims is premised on Title VII.

3.     This Court has personal jurisdiction over Defendant because Defendant is headquartered in Washington, DC.

4.     Venue is proper in this Court pursuant to 42 U.S.C. Section 2000e-5 and 28 U.S.C. Section 1391 as the Defendant resides within this judicial district and a substantial part of the events giving rise to this claim occurred in this judicial district.

5.     Prior to instituting this action, Plaintiff filed an internal EEO Complaint with the Agency.

6.     The Agency issued a Final Decision on or about September 28, 2016.

**PARTIES**

7.     Plaintiff resides at 2525 10th Street N #217, Arlington, VA 22201.

8.     Plaintiff is an African-American woman.

9.     Plaintiff is employed at the Agency's offices located at 717 14th Street, NW, Washington, DC 20005.

10.     Defendant is a United States governmental agency that promotes financial stability by reviewing financial systems to measure and analyze risks, perform essential research, and collect and standardize financial data.

**STATEMENT OF FACTS**

11.     Plaintiff began employment at the Agency on or about December 30, 2013.

12.     Plaintiff is employed as a Supervisory Financial Data Specialist

13.     Plaintiff's job responsibilities include data onboarding, master data management, data quality management, data stewardship, data governance and managing employee performance.

14.     From October 2014 to October 2016, Plaintiff received performance ratings of "Exceeded Fully Successful".

15.     Plaintiff's qualifications include over fifteen years of experience, including: 1) financial data analytics, data quality, data management; 2) international finance; 3) knowledge of financial markets and instruments; 4) knowledge of procurement; 5) business intelligence; 6) a Bachelor's of Science in Computer Programming; 7) a Masters of Business Administration with a major in Finance and Real Estate; 7) over six (6) years experience managing teams.

**There is vacancy for the role of Associate Director of Data Services**

16.     In December 2014 the position of Associate Director of Data Services ("Associate Director"), a supervisory position at the Agency, became available because of the resignation of an Agency employee.

17.     Cornelius Crowley ("Crowley") the Chief Data Officer and Deputy Director of the Agency was the deciding official in charge of hiring a qualified candidate for the Associate Director position.

18.     In May 2015, Plaintiff informed Crowley that she was interested in obtaining the position of Acting Associate Director.

19.     Crowley informed Plaintiff that he would not place any employees in the role of Acting Associate Director.

20.     The position for a permanent Associate Director was publically advertised, including a job announcement on the USAJobs.gov website.

21.     Crowley also announced the Associate Director position during weekly leadership meetings held at the Agency.

22.     The qualifications needed for the Associate Director position included: 1) supervisory experience; 2) international finance experience; 3) data analysis, data quality, and data/metadata management experience; 4) data procurement; and 5) knowledge of financial markets and instruments.

23.     Plaintiff had the qualifications for Associate Director.

**Plaintiff is not selected for the position of Associate Director**

24.     On or about September 24, 2015, Crowley told Plaintiff no applicants had met the qualifications for the Certificate of Eligible for the Associate Director position.

25.     The Certificate of Eligible is a ranked ordered list of eligible candidates created by the Agency Human Resource Office, based on the ranking procedure identified in the job opportunity announcement.

26.     Plaintiff had previously been notified by USAJobs.gov that she had met the Certificate of Eligible.

27.     Stephen Olden ("Olden"), the Agency Associate Director of Data and Business Architecture**,** the subject matter expert in charge of reviewing applications for Associate Director, had also informed Plaintiff that she met the Certificate of Eligible.

28.     Olden had also recommended Plaintiff to Crowley for the position of Associate Director.

29.     Plaintiff was not given an interview for the position of Associate Director as Crowley cancelled the job announcement in order to rewrite the position description.

30.     Crowley indicated that he wanted to rewrite the position description to exclude a library function.

31.     Contrary to his prior announcement that he would not appoint an Acting Associate Director, Crowley created two (2) Acting Associate Director positions.

32.     These positions for Acting Associate Director were not publically advertised, and therefore, Plaintiff did not have a chance to apply for the position.

33.     Employees chosen for the Acting Associate Director position have a better chance to later qualify for the Certificate of Eligible when a permanent position is opened.

34.     Placing an employee in an "Acting" role provides the employee an opportunity to meet the requirements for candidate selection for similar job opening announcements in the future.

35.     On or about October 1, 2015, Crowley informed Plaintiff that she was not selected for the Acting Associate Director position.

36.     Crowley renamed the Data Services section to Data Operations.

37.     There were no material differences in the job responsibilities between the Acting Associate Director of Data Services and the Acting Associate Director of Data Operations.

38.     Crowley appointed two (2) White Agency employees, to the positions of Acting Associate Director.

39.     The terms of the Acting Associate Directors were supposed to be 120 days.

40.     The two (2) appointed employees, Rita McPheeters ("McPheeters") and Whitney Cromie ("Cromie") had less experience than Plaintiff.

41.     McPheeters did not have 1) international finance experience; 2) data analysis, data quality, and data/metadata management experience; 3) practical/ working knowledge of financial markets and instruments.

42.     McPheeters had not made the Certificate of Eligible for the position of Associate Director.

43.     Whitney Cromie did not have prior management experience.

44.     Between October 1, 2015 and October 7, 2015, Plaintiff made direct inquiries to Crowley regarding her future candidacy for the Acting Associate Director position.

45.      Crowley did not give Plaintiff detailed information on the status of her candidacy.

46.     On or about October 8, 2015, Plaintiff emailed Crowley to 1) reaffirm her interest in the Acting Associate Director position; and 2) request the selection criteria for the Acting Associate Director position.

**Plaintiff files an EEO Complaint**

47.     On or about October 13, 2015, after not being selected for the Associate Director position or Acting Associate Director position, Plaintiff met with Andre Faulk, the Agency EEO Director, and made a complaint that she was not selected for the

Associate Director, and Acting Associate Director positions because she was an African-American female.

48.     On or about October 16, 2015, Plaintiff filed an internal EEO Complaint (the "Complaint") related to not being selected for the Associate Director or Acting Associate Director position.

49.     On or about October 22, 2015, Jesse Hansley ("Hansley") was assigned to be Plaintiff's EEO Counselor.

50.     On or about October 27, 2015, Hansley and Plaintiff met to discuss and process the Complaint.

51.     On or about November 3, 2015 Hansley contacted Nicole Bynum ("Bynum"), the Agency Chief Operating Officer, to discuss the Complaint and set a date for the mediation session pursuant to the Alternative Dispute Resolution process.

**Plaintiff is retaliated against after filing the EEO Complaint**

52.     Prior to Plaintiff filing the EEO Complaint, Crowley had scheduled weekly recurring meetings with certain Agency employees, including Plaintiff and McPheeters.

53.     These meetings were needed to discuss challenges and define responsibilities for Plaintiff's employment roles.

54.     Within one (1) week of Plaintiff filing the internal EEO Complaint, Crowley canceled the recurring meetings.

55.     When McPheeters suggested that the meetings be reestablished, Crowley suggested that the meetings be held without him.

56.     The weekly meetings were never resumed.

57.     Prior to filing the EEO Complaint, on or about October 16, 2015, Plaintiff had received an annual appraisal rating for fiscal year 2014 of "Exceeds Fully Successful".

58.     On or about November 16, 2015, Crowley downgraded Plaintiff's appraisal rating to "Fully Successful".

59.     Crowley had never discussed any issues with Plaintiff's performance for fiscal year 2015.

60.     Plaintiff filed and Administrative Grievance with Human Resource Office challenging her downgraded appraisal rating for fiscal year 2015.

61.     On or about November 19, 2015 Crowley emailed certain Agency employees, including Plaintiff, and requested that the employees provide a list of major achievements for 2015.

62.     Crowley requested that these accomplishments be provided by November 20, 2015

63.     Plaintiff received and responded to Crowley's request on November 20, 2015, several hours after deadline.

64.     On or about November 23, 2015 Crowley publicly cited the major achievements submitted by all Agency employees listed on the email dated November 19, 2015, including major achievements submitted by Plaintiff.

65.     Crowley publicly thanked all Agency employees listed on the email dated November 19, 2015, by naming each individually in the Agency-wide meeting.

66.     Plaintiff was excluded from the public announcement in the Agency-wide meeting thanking the Agency employees for achievements.

67.     Plaintiff was excluded from all other public recognition.

**Plaintiff continues to be discriminated against**

68.     Cromie resigned as Acting Associate Director on or about February 2016.

69.     Crowley selected Dana Jurcul ("Jurcul"), a White Agency employee, to fill Cromie's previous position.

70.     Jurcul's appointment provided for an increase in pay and was categorized as a temporary promotion.

71.     The Acting Associate Director position was two (2) grade levels above Jurcul's grade level.

72.     In January 2016, Crowley offered Plaintiff the position of Acting Associate Director of Data Operations.

73.     Crowley informed Plaintiff that the position of Acting Associate Director of Data Operations could not be offered as a paid temporary position.

74.     Olden informed Plaintiff that the position of Acting Associate Director of Data Operations was eligible for a temporary promotion.

75.     On or about February 4, 2016, Plaintiff informed an Agency Human Resources representative that Crowley had offered Jurcul a temporary position that included a pay increase, while denying Plaintiff the same increase.

76.     The Agency's Human Resources Department rescinded Jurcul's appointment as Acting Associate Director, noting that it violated Agency policy to promote an employee to a level two grades above the current grade level.

77.    On or about February 4, 2016, after Plaintiff's conversation with the Human Resources representative, Plaintiff was offered the position of Acting Associate Director of Data Operations as a paid temporary promotion.

**The vacancy for the role of Associate Director of Data Operations is posted**

78.    In March 2016, the position of Associate Director of Data Operations a supervisory position at the Agency, was posted.

79.    The position of Associate Director of Data Operations is the rewritten position description that replaced the Associate Director of Data Services.

80.    Crowley was the deciding official in charge of hiring a qualified candidate for the Associate Director of Data Operations position.

81.    The position for a permanent Associate Director of Data Operations was advertised publically, including a job announcement on the USAJobs.gov website.

82.    Crowley also announced the Associate Director of Data Operations position during weekly leadership meetings held at the Agency.

83.    The qualifications needed for the Associate Director of Data Operations position included: 1) supervisory experience; 3) data analysis, data quality, and data/metadata management, data stewardship experience; 4) data procurement; and 5) knowledge of financial markets and instruments.

84.    Plaintiff had the qualifications for Associate Director of Data Operations.

85.    Plaintiff was notified by USAJobs.gov that she met the Certificate of Eligible for the position of Associate Director of Data Operations.

**Plaintiff continues to be subjected to discrimination and/or retaliation**

86.     On or about February 22, 2016, Plaintiff began the position of Acting Associate Director of Data Operations.

87.     In February 2016, Richard Berner, Agency Director, began a series of bi-weekly meetings with Crowley and the Agency associate directors under Crowley's direct supervision, including Plaintiff.

88.     On or about February 24, 2016, Berner held a meeting at which Plaintiff was present.

89.     During the meeting, Berner made statements about differing performance appraisal ratings and decreasing EEO Complaints.

90.     After this meeting, Crowley began to have weekly one-on-one meetings with each of his direct reports.

91.     Crowley did not begin weekly one-on-one meetings with Plaintiff.

92.     On or about March 21, 2016, Plaintiff's appraisal rating was restored to "Exceeds Fully Successful."

93.     On April 26, 2016, in Berner's biweekly meeting, Berner requested Plaintiff provide honest feedback about the Agency.

94.     Plaintiff indicated to Berner that, because of retaliation, she feared conveying an honest opinion.

95.     Berner encouraged Plaintiff to honestly respond.

96.     Plaintiff indicated disapproval of Agency leadership practices.

97.     Berner expressed disagreement and disapproval of Plaintiff's opinion.

98.     On or about May 2, 2016, approximately one (1) week after Plaintiff expressed her opinion to Berner, Plaintiff was declined for the position of Associate Director without ever being granted an interview.

99.     Crowley indicated to Jerilyn Gomez ("Gomez") an Agency employee and Human Resources liaison that he was looking for a specific male candidate with Capital Markets experience to fill the Associate Director of Data Operations position.

100.    Plaintiff spoke with Gomez about the Associate Director position.

101.    Gomez indicated that the public Certificate of Eligible was "vet-blocked".

102.    Vet-blocked is a colloquial term used by government employees to indicate that the USERRA / VETS laws took precedence yielding a Veteran as the leading candidate, thus blocking all non-veteran candidates.

103.    Crowley informed Tari Thompson an Agency employee and EEO Counselor he was looking for a broader pool of candidates.

104.    In June 2016, the position of Associate Director of Data Operations was reposted.

105.    Crowley changed the questions in the job announcement on the USAJobs.gov website.

106.    The questions referred to capital markets data and procurement experience.

107.    The new questions in the job announcement yielded a smaller candidate pool.

108.    Plaintiff did not apply to the third vacancy announcement for the position.

109.   On or about February 26, 2016, Crowley and Plaintiff met to discuss performance commitments for her tenure as Acting Associate Director.

110.   Crowley requested Plaintiff create an operational report for the Data Operations section.

111.    Plaintiff indicated she would need information from the Research and Analysis Center to complete the report.

112.   Plaintiff was on annual leave from February 27, 2016, until March 9, 2016.

113.   On or about March 9, 2016 Plaintiff emailed Jill Cetina ("Cetina"), the Agency Associate Director in the Research and Analysis Center, to obtain information to complete the operational report requested by Crowley.

114.   Cetina contacted McPheeters to inquire about Plaintiff's request.

115.   Cetina had no knowledge of Plaintiff's new role as Acting Associate Director of Data Operations.

116.   Crowley did not announce Plaintiff's new role as he had done when McPheeters and Cromie were appointed to their roles as Acting Associate Directors.

117.   McPheeters emailed Plaintiff and copied, Kevin Kostka ("Kostka") a Supervisory peer, and indicated that Plaintiff must consult McPheeters before Plaintiff made any requests of anyone in the Research and Analysis Center.

118.   On or about March 10, 2016, Crowley questioned Plaintiff about the request she made to Cetina.

119.   Plaintiff informed Crowley she requested information from Cetina to complete the operational report Crowley assigned on February 26, 2016.

120.    Crowley stated he would follow-up with the Deputy Director of Research.

121.    The Deputy Director of Research declined Plaintiff's request.

122.    Plaintiff informed Crowley she would be unable to complete the mandated operational report without the requested information.

123.    Crowley informed Plaintiff that McPheeters and Kostka did not want to work with Plaintiff.

124.    Crowley suggested that Plaintiff meet with Tamika Williams ("Williams") an Agency employee and Human Resource Representative.

125.    Williams' expressed approval for Plaintiff's course of action, and indicated she would direct Crowley to support Plaintiff.

126.    Between March 15, 2016, and the end of May 2016, Plaintiff complained to Crowley several times that McPheeters' anger toward Plaintiff was escalating. Plaintiff indicated that McPheeters' anger was affecting the work environment.

127.    Crowley continued to direct Plaintiff to have one-on-one with meetings with McPheeters despite his awareness of McPheeters growing hostility toward Plaintiff.

128.    Plaintiff informed Crowley that she was unable to get necessary information from McPheeters regarding important meetings.

129.    Crowley directed Plaintiff not to attend several of McPheeters' meetings.

130.    The meetings Plaintiff inquired about covered important new high profile Agency projects, and associate directors from other divisions attended the meetings.

131.    In April 2016 Crowley indicated that he would seek McPheeters input for Plaintiff's midyear appraisal rating.

132.    Crowley indicated Plaintiff will not have a similar opportunity to rate McPheeters.

133.    Upon receiving guidance from a Human Resources representative, Crowley changed his mind, and allowed Plaintiff to have input on McPheeters' midyear appraisal rating.

134.    Crowley requested that Plaintiff's provide input on McPheeters' performance.

135.    Plaintiff provided feedback on McPheeters' work performance, and excluded any negative interactions.

136.    McPheeters submitted a negative review about Plaintiff.

137.    Crowley used the McPheeters review as a sole reason to downgrade Plaintiff's appraisal rating for Teamwork.

138.    Between March 10, 2016 and June 30, 2016, Crowley repeatedly changed Plaintiff's performance commitments for the Acting Associate Director of Data Operations and her permanent Supervisory position. The permanent Supervisory position is Plaintiff's current level OR-60 position, that she would return to once her 120-day tenure as Acting Associate Director is completed.

139.    After Plaintiff informed Crowley that she could not complete the operational report without the information from the Research staff, on or about March 10, 2016 Plaintiff, Crowley agreed that Plaintiff could work on a new employee rewards program.

140.    Plaintiff held meetings with several staff to define specifications for an employee recognition program; and Plaintiff discussed preliminary criteria at Agency meetings.

141.    Berner expressed approval of Plaintiff's ideas in one of his biweekly meetings.

142.    Crowley indicated Plaintiff could not include the accomplishment in her appraisal rating.

143.    On or about March 29, 2016 Crowley changed Plaintiff's performance commitments again and directed Plaintiff to create a partial operational report using information from McPheeters' area.

144.    Plaintiff contacted McPheeters to obtain information.

145.    McPheeters would not provide the information.

146.    Plaintiff informed Crowley about McPheeters' refusal to provide the requested information.

147.    On or about March 29, 2016, Crowley directs Plaintiff to review Position Description for Associate Director of Data Operations to come up with new performance commitments for her tenure as Acting Associate Director of Data Operations.

148.    Plaintiff indicated to Crowley that it was confusing to have her performance commitments continuously change.

149.    Plaintiff told Crowley she needed to work on performance commitments for her permanent Supervisory role.

150.    Crowley did not readjust Plaintiff's milestone dates for her permanent Supervisory position, while Plaintiff was Acting Associate Director.

151.   Plaintiff asked Crowley for direction on the operational document. The deliverable was a performance commitment for Plaintiff's Supervisory position.

152.   Crowley indicated Plaintiff could choose any methodology as long as the methodology allowed all job duties to reside solely within the Data Division.

153.   This directive required Plaintiff to research a new approach because the current methodology assigned job duties to other divisions across the Agency.

154.   Plaintiff submitted first draft for Crowley's review on April 14, 2016.

155.   On or about May 4, 2016, Crowley announced in his weekly leadership meeting that Kimberly McLane, ("McLane") an Agency employee and Associate Director of the Program Management Office, would review and provide feedback on Plaintiff's operational guide.

156.   The operational guide was one of Plaintiff's performance commitments for fiscal year 2016.

157.   McLane is not a part of Crowley's / Plaintiff's division.

158.   When Plaintiff questioned Crowley about his directive, he changed it, and directed Plaintiff to use McLane as a resource.

159.   Plaintiff met with McLane twice, and McLane referred plaintiff to read two (2) books; but otherwise McLane provided no further information that Plaintiff could incorporate into the document.

160.    On May 10, 2016, Crowley completed review of the operational guide.

161.   On or about May 12, 2016, during Plaintiff's midyear performance review Crowley returned the operational guide with significant markings, indicating which areas should be revised.

162.    Plaintiff inquired about the extensive need for revisions.

163.    Crowley declined to address any questions, and directed Plaintiff to review the notes he made.

164.    Crowley requested Plaintiff learn the GAO-14-704G, Standards for Internal Control in the Federal Government ("GAO"); the GAO was approximately 90 pages long.

165.    Plaintiff inquired with several Agency employees on different teams within the Agency and no one had ever heard of or used the document in their job.

166.    Crowley directed Plaintiff to complete the operational guide in November 2015, but had never mentioned the GAO prior to May 2016.

167.    Plaintiff responded to Crowley's critiques of her work and complained about the excessive scrutiny that she received about her work.

168.    Plaintiff complained that Crowley was assigning her work that was typically performed by other areas.

169.    Crowley did not respond for several weeks.

170.    In June 2016, within hours of Plaintiff initiating a new EEO complaint, Crowley emailed Plaintiff to again change the performance commitment for the operational guide.

171.    In or about October 2016, during Plaintiff's end of the year appraisal, Crowley penalized Plaintiff for not completing the operational guide.

172.    Beginning in April 2016, Plaintiff began to have problems with a direct report, Teuta Weiland ("Weiland").

173.    Problems with Weiland included: Weiland's engaging in conflict with another employee who reported to Plaintiff; Weiland making allegations against Plaintiff to other Agency employees; and Plaintiff being threatened by Weiland.

174.    Brown and Crowley had previously recommended that Weiland contact the Employee Assistance Program.

175.    On or about April 12, 2016, Plaintiff contacted, Barbara Pabotoy ("Pabotoy"), Agency Chief of Human Resources and expressed concerns about Weiland and the safety of Plaintiff's team. Plaintiff requested a Human Resource professional evaluate Weiland for fitness to work.

176.    Olden contacted Plaintiff on behalf of Pabotoy, and Plaintiff informed Olden that she did not feel safe in the office with Weiland.

177.    Plaintiff temporarily ceased all in-person communications with Weiland, and only used email to communicate with Weiland.

178.    On or about April 14, 2016 Plaintiff met with Human Resource Representative, Thalia (Dineen) Abraham, who indicated that either she or Williams would meet with Weiland.

179.    Plaintiff sent multiple requests to Williams, Abraham, and Crowley for guidance, and expressed concerns for her safety; she also made multiple requests to meet with Williams, Abraham, and Crowley.

180.    Plaintiff received no response from Crowley, Abraham, or Williams.

181.    On or about May 4, 2016, Plaintiff contacted Williams to discuss the situation regarding Weiland.

182.    Williams instructed Plaintiff to collect statements from employees.

183.    Plaintiff requested a statement from Kennedy Wilson ("Wilson") an Agency employee and McLane's direct report.

184.    Wilson informed Plaintiff that McLane and Weiland were very close.

185.    McLane contacted Plaintiff, and indicated that Plaintiff deserved the treatment that she was receiving from Weiland.

186.    McLane also stated that Plaintiff was not qualified to be the Associate Director.

187.    Wilson later indicated to Plaintiff he sent McLane to her office.

188.    Plaintiff requested that Raymond Mosher ("Mosher"), another Agency employee, submit a statement attesting to the treatment that she was receiving; Mosher agreed but never submitted the statement.

189.    Williams declined to investigate Plaintiff's accusations.

190.    Williams met with Weiland, and thereafter Weiland contacted Plaintiff and accused Plaintiff of creating a hostile work environment for Weiland.

191.    Plaintiff contacted Faulk about the situation with Weiland; and Faulk directed Williams to assist Plaintiff.

192.    Weiland filed an EEO complaint against Plaintiff.

193.    The Agency EEO office characterized the complaint to as a workplace dispute.

194.    Plaintiff scheduled Weiland's performance appraisal, and requested that Crowley attend the appraisal meeting.

195.    Crowley refused to attend the meeting, and instructed Plaintiff to ask someone else.

196.    Plaintiff contacted the Human Resource representative to request a third party attend Weiland's performance appraisal.

197.    Crowley later agreed to attend the appraisal meeting

198.    Plaintiff also asked McLane to attend Weiland's performance review.

199.    McLane declined Plaintiff's request, and again indicated that Plaintiff deserved the treatment that she was experiencing.

200.    On or about May 12, 2016, during Plaintiff's midyear performance review Crowley stated the Office of Human Resources ("OHR") opened an investigation on Plaintiff to investigate her for several employee complaints.

201.    Crowley stated that Plaintiff had a negative tone on emails with McPheeters.

202.    Crowley indicated that Plaintiff was abusing the employees, and indicated that employee interviews would be conducted to assess Plaintiff behavior for disciplinary measures.

203.    Crowley did not indicate which employees had made complaints.

204.    On or about May 12, 2013, during midyear performance review, Crowley presented Plaintiff with a reworded Performance Commitment that rated Plaintiff's performance on collaboration / cohesiveness of the unit.

205.    Crowley scheduled three (3) weekly one-on-one meetings with Plaintiff immediately after her midyear performance review.

206.    Crowley canceled all three one-on-one meetings.

207.    After Plaintiff's role as Acting Associate Director of Data Operations ended, Crowley appointed Traci Hellwig an Agency employee and Associate Director in Information Technology to fill the Acting Associate Director of Data Operations role.

208.    Williams contacted Plaintiff in August 2016, to request a meeting.

209.    During the meeting, Williams interviewed Plaintiff for the OHR investigation nearly three (3) months after investigation was initiated.

210.    In early September 2016, Plaintiff's nametag was removed from her office.

211.    In December 2016, Plaintiff's nametag was removed and the phrase "Get Fired Already" was written on her office door

## COUNT I
### Racial Discrimination
### [Title VII, 42 U.S.C. § 2000e, *et seq.*]

212.    Plaintiff re-alleges every allegation contained in this Complaint as if set forth fully herein.

213.    At all relevant times, Defendant was and continues to be an "employer" within the meaning of Title VII.

214.    At all relevant times of Plaintiff's employment with Defendant, Plaintiff was and continues to be an "employee" within the meaning of Title VII.

215.    By acts and omissions alleged above, Defendant intentionally deprived Plaintiff of equal employment opportunities, and otherwise adversely affected her status as an employee, by ultimately denying her certain employment opportunities, including promotions, on the basis of her race and in violation of 42 U.S.C. §2000e-2.

216.    As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, a loss of wages and salary, bonuses, compensation, employment benefits, career path opportunities, and expenses in an amount to be proved at trial.

217.    As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, generally physical, mental, and psychological damages in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish, and emotional distress, in amounts within the jurisdictional limits of this Court, to be proved at trial.

218.    As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided for by applicable law.

**Count II**
**Sex Discrimination**
**[Title VII, 42 U.S.C. § 2000e, *et seq.*]**

219.    Plaintiff re-alleges every allegation in this Complaint as if set forth fully herein.

220.    At all relevant times, Defendant was and continues to be an "employer" within the meaning of Title VII.

221.    At all relevant times of Plaintiff's employment with Defendant, Plaintiff was and continues to be an "employee" within the meaning of Title VII.

222.    By acts and omissions alleged above, Defendant intentionally deprived Plaintiff of equal employment opportunities, and otherwise adversely affected her status as an employee, by ultimately denying her certain employment opportunities, including promotions, on the basis of her sex and in violation of 42 U.S.C. §2000e-2.

223.    As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, a loss of wages and salary, bonuses, compensation, employment benefits, career path opportunities, and expenses in an amount to be proved at trial.

224.    As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, generally physical, mental, and psychological damages in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish, and emotional distress, in amounts within the jurisdictional limits of this Court, to be proved at trial.

225.    As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided for by applicable law.

## Count III
## Retaliation
## [Title VII, 42 U.S.C. § 2000e, *et seq.*]

226.    Plaintiff re-alleges every allegation contained in this Complaint as if set forth fully within.

227.    Because Plaintiff engaged in protected activity by filing complaints within the meaning of Title VII, Defendant unlawfully discriminated against Plaintiff by downgrading Plaintiff's annual appraisal rating; denying Plaintiff additional compensation; and continuously subjecting Plaintiff to more discriminatory acts.

228.    As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, a loss of wages and salary, bonuses, compensation, employment benefits, career path opportunities, and expenses, in an amount to be proved at trial.

229.    As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, generally physical, mental, and psychological damages in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish, and emotional distress, in amounts within the jurisdictional limits of this Court, to be proved at trial.

230.    As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided for by applicable law.

## JURY DEMAND

Plaintiff demands a trial by jury for those issues which are triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Aisha Edwards, prays for the following relief: Entry of judgment in favor of Plaintiff and against Defendants for:

a.    Lost wages;

b.    Compensatory damages;

c.    Reasonable attorneys' fees and court costs associated with this suit;

d.    Awarding prejudgment interest, costs and disbursement as appropriate herein; and

e.    Other relief as may be appropriate to effectuate the purposes of Title VII and that this Court and jury deems equitable, appropriate, and just.

Respectfully submitted,


_____
          /s/
Kieran Riley (DC Bar No. 1002844)
The Spiggle Law Firm, PLLC
4830A 31st St., South
Arlington, Virginia 22206
(202) 499-8527 (telephone)
(202) 540-8018 (facsimile)
*Counsel for Plaintiff*